Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1623 | **DATE** | 11/16/2001 |
| **CASE TITLE** | Rouse-Randhurst vs. JC Penny Co., Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Because there is no genuine issue of material fact in this action, and because Rouse has successfully demonstrated that Penny breached the operating covenant by ceasing its operating before June 30, 2005, Rouse is entitled to an interlocutory judgment as a matter of law as to the issue of liability. Its Rule 56 motion for such a summary judgment is therefore granted (11-1), and Penney's attempt to frame a cross-motion is denied. With those issues having been resolved, Rouse is entitled to damages stemming from Penny's breach of the Operating Covenant, the extent of which damages remains to be determined. Accordingly, this case is set for a status hearing at 9 a.m. November 26, 2001.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | NOV 19 2001 date docketed | 70 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 11/16/2001 date mailed notice | |
| SN | courtroom deputy's initials | 01 NOV 16 PM 3:57 Date/time received in central Clerk's Office | SN mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROUSE-RANDHURST )
SHOPPING CENTER, INC., )
 )
       Plaintiff, )
 )
v. ) No. 01 C 1623
 )
J.C. PENNEY COMPANY, INC., )
 )
       Defendant. )

MEMORANDUM OPINION AND ORDER

Rouse-Randhurst Shopping Center, Inc. ("Rouse") originally filed this state law breach of contract action against J.C. Penney Company, Inc. ("Penney") in the Circuit Court of Cook County. Penney then timely removed the action to this District Court under the diversity of citizenship fount of federal jurisdiction.[1] Rouse charges Penney with the breach of an operating covenant contained in the lease between the parties, and it has now filed a Fed. R. Civ. P. ("Rule") 56(c) motion for an interlocutory summary judgment on the issue of liability. Both sides have complied with this District Court's LR 56.1,[2] and

---

[1] Rouse is a Maryland corporation with its principal place of business in Illinois, Penney is a Delaware corporation with its principal place of business in Texas and the amount in controversy is far in excess of $75,000.

[2] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Rouse's LR 56.1(a)(3) statement as "R. St. ¶--" and to Penney's 56.1(b)(3)(B) statement of additional facts as "P. St. ¶-." Penney's Response to Rouse's LR 56.1(a)(3)

the issue of liability is fully briefed and ready for decision. For the reasons set out in this opinion, Rouse's motion is granted.

## Summary Judgment Standards

Familiar Rule 56 principles impose on Rouse the burden of establishing the absence of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., 116 F.3d 262, 265 n.2 (7th Cir. 1997)). And as Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) has quoted from Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994)):

> A genuine issue of material fact exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As with any summary judgment motion, this Court accepts nonmovant Penney's version of any disputed facts, although in this case of contract interpretation the two parties are in essential agreement about the facts. What follows in the Facts section is culled from the parties' submissions.

---

statement is cited as "P. Resp. ¶-," although whenever any R. St. assertion is not controverted a citation to that statement ordinarily suffices. This opinion employs the same "R." and "P." abbreviations when referring to the parties' exhibits and memoranda.

2

## Facts

Rouse owns and operates the Randhurst Shopping Center ("Randhurst") in Mount Prospect, Illinois (R. St. ¶1). Penney operates retail department stores throughout the country, one of those stores having been located in Randhurst until recently (R. St. ¶2).

Rouse and Penney were the ultimate parties to a lease of one of the three anchor tenancies in Randhurst--a lease that had originated long before either of them entered the picture (R. St. ¶7). On May 26, 1961 Rouse's unrelated predecessor in interest entered into a 30-year lease with Carson Pirie Scott & Company ("Carson") for a department store in Randhurst (R. St. ¶¶8, 10; P. St. ¶1). Two of the several later lease amendments bear on Rouse's current claim:

> 1. On June 25, 1981 (by the "1981 Amendment") the lease was extended for 10 years, creating a new termination date of June 30, 2001 (R. St. ¶¶12-13). That same amendment also granted the lessee renewal options for four consecutive periods of five years each following the termination of the lease.[3] In what has become the source from which the

---

[3] Another provision of the original lease, which remained intact throughout its term, specified that if the lessee continued to occupy the premises after the lease terminated, during that holdover period the lessee would "be deemed to be occupying the Demised Premises as a tenant from month to month, subject to all the covenants, agreements and conditions of this lease insofar as the same are applicable to a month to month

3

current controversy stems, the 1981 Amendment also added a covenant for continuous operation (referred to there and throughout this opinion as the "Operating Covenant") (R. St. ¶14) under which the lessee agreed to operate continuously, or to cause to be operated continuously, a department store on the premises until June 30, 1996 (five years before the then termination date of the lease)(R. St. ¶15).

2. On September 1, 1989 (by the "1989 Amendment") Rouse (which had succeeded to Randhurst's ownership in 1988) and a Carson affiliate (then the lessee) extended the term of the Operating Covenant for an additional nine years--until June 30, 2005 (R. St. ¶19).[4] As a consequence, the Operating Covenant extended for four years beyond the original expiration date of the lease itself, although the lessee's options for extensions stretched far beyond the

---

tenancy" (R. St. ¶27).

[4] Penney's Mem. 12 n.5 contends that the 1989 Amendment never became operative because Rouse has failed to provide documentation proving that the other anchor tenants in Randhurst consented to the amendment as required by the lease. Any such argument has long since been waived (or perhaps more accurately, forfeited). Penney's assumption of the lease in 1990 expressly included the 1989 Amendment, which had also contained several other substantive modifications of the lease terms (including the rent and other financial aspects). Penney then operated its store for more than a decade under the terms of the lease as so amended. That conduct constitutes an implied waiver of any question of the validity of the 1989 Amendment (see, e.g., Ryder v. Bank of Hickory Hills, 146 Ill. 2d 98, 105, 585 N.E.2d 46, 49 (1992)).

4

June 30, 2005 date.

On May 15, 1990 Carson assigned its rights and obligations under the lease (including the 1989 Amendment) to Penney, and Penney agreed to assume all of those rights and obligations (R. St. ¶22). At some point after it began its Randhurst operations, Penney found the location was unprofitable, and in 1995 it first notified Rouse that it intended to cease its operations in Randhurst at the end of the original lease term (P. St. ¶¶24, 26). In August 2000 Penney again expressed an intention to cease operations at the June 30, 2001 end of the original lease term (P. St. ¶27).

As stated earlier, on January 29, 2001 Rouse initiated a declaratory judgment action in the Circuit Court of Cook County to seek enforcement of the Operating Covenant, and Penney timely removed the case to this District Court. Although this Court sought to obtain an amicable resolution of the dispute, those efforts proved unsuccessful. Penney ceased retail operations in Randhurst on May 31, 2001, and it stopped paying rent on June 30, 2001 (P. St. ¶29).

## Procedural Posture

As a preliminary matter, Penney has argued that it is procedurally improper for Rouse to move for summary judgment as to liability at this juncture. Without citing any caselaw or any other authority to support its position, Penney asserts that

because Rouse's Complaint was framed as one for declaratory judgment to prevent Penney from vacating the store, the present motion for summary judgment as to liability is somehow inconsistent with Rouse's litigation goals.

That argument is totally at odds with common sense, as well as running completely contrary to the federal courts' system of notice pleading. To comply with that pleading regime, plaintiffs need not draft complaints that list causes of action (or in the more precise federal parlance, claims) or that specify legal theories (Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992))--indeed, even an identification of the wrong legal theory does not impair a complaint's viability (id.). Instead, under Rule 8 a complaint need only provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)(citations omitted)).

Here Rouse's Complaint certainly gave Penney notice of its claim and the grounds on which it rests: Penney knew full well that if it were to cease operations at Randhurst before June 30, 2005 Rouse would regard it as being in breach of the Operating Covenant.[5] It would turn the world on its head to view Penney's

---

[5] Indeed, any near-frivolous notion of the type advanced by Penney could be scotched by the readily available Rule 15(b) amendment of the pleadings to conform to the evidence. Under the

6

actual cessation of operations in the period between the filing of the Complaint and the filing of Rouse's motion as shielding it from any liability that it may have for breaching the Operating Covenant. Summary judgment as to liability is appropriately before this Court.

## Interpretation of the Operating Covenant

What is at hand is a straightforward question of contract interpretation, with the parties urging opposite views of the Operating Covenant. Rouse argues at its Mem. 5 that the terms of the Operating Covenant are clear and unambiguous--that by assuming the lease Penney expressly agreed to operate or cause to be operated a department store in Randhurst until June 30, 2005-- and that it was entirely within Penney's power to maintain its presence at Randhurst after June 30, 2001, either by exercising its right to extend the lease for an additional five year period or by continuing as a hold-over tenant. Penney retorts at its Mem. 7 that it views the Operating Covenant as unenforceable because it assertedly conflicts irreconcilably with the lease term--and that response rests on the premise that Penney could not have simultaneously vacated Randhurst on June 30, 2001 (the expiration of the original lease term) and still continued to operate its store until June 30, 2005 (the end of the Operating

---

circumstances here, it would be a needless exercise to require such an amendment.

Covenant Period). Penney's suggested "solution" (at its Mem. 8) is that this Court should "reconcile" the provisions by rewriting the operating covenant so that it too would expire on June 30, 2001. Penney's arguments are simply untenable.

Under Illinois law (which controls pursuant to the lease's Art. XXX, §3) contracts are enforced according to their unambiguous terms (<u>Dowd & Dowd, Ltd. v. Gleason</u>, 181 Ill. 2d 460, 479, 693 N.E.2d 358, 368 (1998)). If a conflict appears among the terms of a contract, a court must seek to reconcile those terms to give effect to the contract as a whole (<u>Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. P'ship</u>, 249 Ill. App. 3d 188, 200, 619 N.E.2d 144, 152 (1st Dist. 1993)). But when there is no conflict, there is of course nothing for a court to reconcile. And no court may rewrite unambiguous contractual terms to grant one party a better bargain than the one it made (<u>Saunders v. Michigan Ave. Nat'l Bank</u>, 278 Ill. App. 3d 307, 316, 662 N.E.2d 602, 610 (1st Dist. 1996)).

Here the unambiguous contractual terms simply do not conflict. Penney's assertions to the contrary, there is nothing inherently irreconcilable about the lease term and the term of the Operating Covenant. Nothing in the lease provisions precluded Penney from fulfilling the duties that it specifically assumed under the Operating Covenant, either by exercising its first option to extend the term of the lease or by remaining in

8

possession of the premises as a holdover tenant. When Penney assumed all of the lessee's obligations under the lease in 1990, it knew full well that the original lease term ended on June 30, 2001 while the Operating Covenant ended on June 30, 2005.[6] At no time were the dates in those two provisions linked either expressly or impliedly.[7] There is simply no support for Penney's suggestion that this Court should rewrite the Operating Covenant by pretending that it had said 2001 instead of 2005, so as to make it coterminous with the lease expiration.

Indeed, Penney has obviously not thought through the potential alternative--which is at least as logical--that if this Court were in the business of rewriting the parties' bargain (as it is not and should not be), the rewriting could just as well take the form of recasting the lease expiration date by extending it to conform to the end of the express term of the Operating

---

[6] It is worth noting that nothing even remotely approaching a contract of adhesion is at issue here. As is typical of such major leases of shopping center premises, every provision (including those in the 1989 Amendment) was spelled out in exquisite detail as the obvious product of hard arms-length bargaining. Penney (like all of the parties on both sides of the lease transaction from the outset) was the paradigmatic sophisticated party that knew exactly what it was getting itself into when it assumed the rights and responsibilities under the lease.

[7] As noted earlier, the 1981 Amendment had set the Operating Covenant to terminate five years before the lease's expiration date, while the 1989 Amendment extended the covenant by nine years, to end four years after the expiration of the original lease term. At no point in time were the Operating Covenant and the lease term coterminous.

9

Covenant: June 30, 2005. In fact, any analysis of the dynamics of shopping center operations and their leases really places such operating covenants at the very top of the priorities scale.

It is a truism that shopping centers rely for their success on the synergistic effect of their leases, both those running to key or anchor tenants (often department stores) and those running to more specialized lessees occupying smaller premises: Anchor tenants are looked to for the generation of foot traffic and hence of business for the other lessees, and in turn the anchor tenants hope for spillover business from persons who initially come to the center to shop at one or more smaller stores and who decide that, once there, they might as well see what the department store may be offering (sort of the equivalent of impulse buying at the supermarket). That phenomenon, coupled with the related fact that percentage rentals rather than guaranteed lease rentals make the difference between a successful center and a marginal or even failing center, make the prospect of an anchor tenant "going dark"--ceasing to operate--a calamity. It is no accident that the very article of the lease that inserted the Operating Covenant--Article XXXIII in the 1981 Amendment, carried forward into the 1989 Amendment--contained a Section 5 that specified in part that if the other two department stores were to discontinue *their* continuous operation for 18 consecutive months, the lessee under the 1989 Amendment

10

(originally Carson and later Penney) would be <u>released</u> from its own Operating Covenant.

To return to the point of beginning--the impermissible notion of judicial rewriting of the lease--Penney's success in advancing such a notion could well call for a rewrite that would leave the Operating Covenant intact and recast the lease term to coexist with that covenant, thus extending the lease itself to June 30, 2005. As Oscar Wilde had one of his characters say in <u>Lady Windermere's Fan</u>:

> In this world there are only two tragedies. One is not getting what one wants, and the other is getting it.

Penney devotes the final section of its response brief to what amounts to a cross-motion for summary judgment on the ground that the Operating Covenant is not specifically enforceable. It contends there that this Court cannot compel Penney either to exercise its option to renew or to remain as a holdover tenant. That however is not at all the issue. Penney may be correct (though it need not be decided for present purposes) that under Illinois law the covenant is not specifically enforceable (see <u>New Park Forest Assocs. II v. Rogers Enters., Inc.</u>, 195 Ill. App. 3d 757, 764-65, 552 N.E.2d 1215, 1219-20 (1st Dist. 1990) and cases cited there), but even a moment's thought discloses that to be a total irrelevancy.

After all, it is only a small segment of the contractual universe that the law treats as specifically enforceable, but any

11

notion that a lack of specific enforceability of a contract somehow correlates with a lack of ability to recover damages for its breach would destroy perhaps the most fundamental principle of contract law. Well before he began his distinguished career on the United States Supreme Court, Oliver Wendell Holmes, Jr. put that principle succinctly more than a century ago in The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897):

> The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it--and nothing else.

And nothing in the intervening century has attenuated the force of that basic truth of contract law--thus the Farnsworth treatise (E. Allan Farnsworth, Contracts §12.4 (3d ed. 999)(emphasis added) has stated the same contrast between damages and specific performance this way:

> [A]lthough the injured party can _always_ claim damages for breach of contract, that party's right to specific relief as an alternative is much more limited.

Just so here. Rouse has requested not an order requiring Penney to reopen its store, but rather a judgment on the issue of liability--an interlocutory judgment that will lead in due course to making Rouse whole in dollars for the losses caused by Penney's breach of the lease's covenant of continuous operation.

On Penney's bootless cross-motion just as on Rouse's motion, Penney's failure to fulfill its responsibilities under the Operating Covenant is attributable entirely to its own decision

12

to close its store on May 31, 2001 and to vacate the lease premises by June 30, 2001, not to any ambiguity or conflict in the contractual provisions. Simply put, Penney has breached its contract with Rouse. And like any other party that elects to breach a contract, Penney is liable for the damages that Rouse has suffered as a result of that breach.

## Conclusion

Because there is no genuine issue of material fact in this action, and because Rouse has successfully demonstrated that Penney breached the operating covenant by ceasing its operations before June 30, 2005, Rouse is entitled to an interlocutory judgment as a matter of law as to the issue of liability. Its Rule 56 motion for such a summary judgment is therefore granted, and Penney's attempt to frame a cross-motion is denied.

With those issues having been resolved, Rouse is entitled to damages stemming from Penney's breach of the Operating Covenant, the extent of which damages remains to be determined. Accordingly, this case is set for a status hearing at 9 a.m. November 26, 2001 to discuss the necessary procedures and timetable to that end.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 16, 2001